UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JACINTO JOSE VALDOVINO,

Petitioner,

v.

MATTHEW ATCHELY,

Respondent.

No.  2:20-cv-00939 TLN GGH P

FINDINGS AND RECOMMENDATIONS

*Introduction and Summary*

Petitioner, a state prisoner proceeding with counsel, has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The matter was referred to the United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 302(c).

This is a difficult case in that the undersigned must review factual findings regarding the effectiveness of defense counsel's advice in the plea bargain process which often, and in this case, essentially involves only the client/defendant and attorney. The deliberative process in advising a client about a plea offer is shrouded in secrecy most of the time. When years later, a dispute erupts about the actions of the two participants in the plea offer setting, determining the actuality of what was discussed, advised, and recommended generally relies solely on post hoc credibility assessments vis-à-vis the attorney and client.

1

For the reasons set forth herein, the undersigned cannot find that the state court's ultimate assessment—that no actionable ineffective assistance of counsel took place in the plea offer setting—was AEDPA[1] unreasonable, either because of process or findings on the prejudice component of ineffective assistance of counsel. On the dual punishment sentencing issue, petitioner cannot prevail as such is a non-cognizable determination based on state law. Accordingly, the undersigned will recommend this petition be denied. However, in consideration of the substantial arguments made by petitioner, and the difficulty of the issues here, the undersigned will recommend a certificate of appealability be issued on the ineffective assistance of counsel claims.

*Issues Presented*

In light of the comprehensive review of the pleadings herein, and after oral argument at hearing, the undersigned has slightly reformulated the order and specificity of issues presented as were set forth by the parties:

1. Whether Judge Boeckman's presiding at the evidentiary hearing render the fact-finding process regarding ineffective assistance of counsel lacking in due process and hence, AEDPA unreasonable.

2. Whether the factual findings of Judge Boeckman regarding prejudice from ineffective assistance of counsel was AEDPA unreasonable thereby rendering the factual findings subject to *de novo* review in federal court.

3. Whether trial counsel's actions during the plea-bargaining stage fell below an objectively reasonable standard thereby rendering *de novo* review in federal court.

4. Whether petitioner's consecutive sentence violates a federal constitutional right.

*Factual Background*

The California Court of Appeal, Third Appellate District (hereinafter "Court of Appeal") adequately set forth the background facts underlying petitioner's conviction for kidnapping and attempted murder:

---

[1] On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA").

1
2
3
4
5
6
7

> At night on June 13, 2010, defendant Jacinto Jose Valdovino (a member of the Norteño gang) approached A. [(Santoya)] (a member of the Sureño gang) in a Sureño-controlled park in Redding and started talking to him. Defendant then told A. to tell his girlfriend to leave before both of them got shot and showed A. a gun in his waistband. A.'s girlfriend left. At defendant's direction, A. followed defendant to a car that had just pulled up, the two got in, and defendant told the driver to go. The driver stopped at several turnouts, but defendant said, " 'No, [n]o. Not right here, not right here.' " The driver then stopped at another turnout, and defendant got out of the car and ordered A. out of the car. Defendant repeatedly shot at A., hitting him in the leg. Defendant got back into the car, and the car sped off.

8
9
10
11

> A jury found defendant guilty of attempted murder, kidnapping, assault with a firearm, and participation in a street gang. The jury also found true gang enhancements and personal use of a firearm enhancements. The court found defendant had a prior strike and had served a prior prison term and sentenced him to 67 years to life in prison.

12    People v. Valdovino, No. C072078, 2013 WL 6001038, at *1 (Cal. Ct. App. Nov. 13, 2013).

13    As reported by the Court of Appeal, petitioner prevailed on two issues, not relevant here,

14    requiring a remand on sentencing issues. The remand resulted in a sentence of 15 years to life for

15    attempted murder, and a consecutive 59-year determinate sentence. An appeal of this

16    resentencing was affirmed. People v. Valdovino, No. C076774, 2015 WL 1254415 (Cal. Ct. App.

17    Mar. 17, 2015).

18    Ineffective Assistance of Counsel

19    *Procedural Facts Regarding Plea Offer*

20    Insofar as the objective procedural facts of the plea-bargaining process are undisputed, the

21    undersigned sets them out here. Prior to trial, the prosecution offered two plea agreements of 16

22    years/8 months, and later, closer to trial, an 18 year "floor." Petitioner had a prior criminal record

23    which required that 85% of any sentence be served. As trial was about to begin, petitioner's

24    counsel was surprised by the revelation that the victim witness, who also had pending, serious

25    criminal charges not related to this case, had reached a cooperation agreement with the

26    prosecution.  More will be said about this as the specific facts relating to the plea offer process are

27    detailed below. Suffice it to say presently that after the revelation, despite efforts by defense

28    ////

3

counsel to obtain an offer of 12-14 years, the prosecution was now unwilling to consider any plea agreement which did not include an indeterminate life sentence.

Prior to the completion of resentencing proceedings in the trial court, petitioner filed his first state habeas petition in Superior Court.  The judge who presided at trial (Hon. Boeckman) rejected the petition without evidentiary hearing both on procedural grounds and on the merits in a written order dated February 18, 2014. ECF No. 33-11 at 16-21.[2]  Amongst other findings, Judge Boeckman found petitioner's arguments "absurd" in part and otherwise rejected petitioner's assertions, i.e., petitioner's assertions were self-serving and not credible.

After a subsequent petition to the Court of Appeal was rejected, petitioner filed a petition with the California Supreme Court.  That state Supreme Court ordered an evidentiary hearing to take place in Superior Court. Specifically, the key issues were whether petitioner received advice about the plea offers, if any, and whether petitioner would have accepted any of the non-life plea offers.

After hearing evidence, the hearing judge, again Judge Boeckman, again denied the petition. The judge announced his ruling from the bench after stating that because credibility of the witnesses was the key concern, there was no need to await a written ruling.  No decision was made with respect to Strickland's first prong of ineffective assistance, i.e., whether counsel's performance was unreasonably deficient.[3]  Judge Boeckman, although having some problems

---

[2] The undersigned will at all times utilize the e-page number in this court's CM/ECF system. The parties have at times cited to the pagination in an original document, but this is confusing due to the number of filed documents within a particular ECF No., and at times, multiple paginations in the same document.

[3] Strickland v. Washington, 466 U.S.668, 698 (1984). Judge Boeckman specifically found the following:

> But my tentative view of the evidence is that Mr. Ruffcorn did not take it out of Mr. Valdovino's hands and reject the offer. And I find factually that Mr. Ruffcorn did transmit or tell Mr. Valdovino about all three of these plea bargain offers.  I don't think he told the defendant he should not accept them.

> And so we get into—first of all, there's a legal issue, and that how you view the facts, was the first prong met.  *And I could make an argument both ways in that regard.*

> But as to the second prong [...]

with defense counsel's (Ruffcorn) memory/credibility, flatly rejected petitioner's credibility on whether he would have accepted any of the less than life imprisonment plea offers. See below. An important part of the credibility analysis hinged on the judge's years old memory of petitioner's lack of credibility at the initial trial—ergo—lack of credibility at evidentiary hearing.

Further petitions to the Court of Appeal and the California Supreme Court subsequent to the Superior Court evidentiary hearing were denied without comment.

### Legal Standards for Ineffective Assistance of Counsel at Plea Bargaining Stage

The general standards for demonstrating ineffective assistance of counsel are well established:

> The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id., at 687, 104 S.Ct. 2052. [Strickland v. Washington, 466 U.S.668 (1984)]

> With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id., at 694, 104 S.Ct. 2052. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Id., at 693, 104 S.Ct. 2052. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id., at 687, 104 S.Ct. 2052.

> ***

> Establishing that a state court's application of Strickland was

> ***

> Because even if I were to determine the first prong of the Strickland analysis in favor of your client, and that is to conclude that there was ineffective assistance of counsel during the plea bargain stage, I don't believe that your client was of a mind [to accept any plea offer.]

ECF No. 46-1 at 236, 239 (emphasis added).

The above were the sum total of two "findings" on counsel's (Ruffcorn's) effectiveness in advising about the plea offers. The court's somewhat disjointed ruminations on what might have taken place between petitioner and his counsel, in no way equates to a ruling on the merits. There is a danger in giving lengthy oral, off-the-cuff rulings in that one omits what needs to be said and/or often does not say what is intended, i.e., there is no editing process; but the ruling here can only be judged at this time by what was said. Respondent's assertion that an "implicit" determination was made on Strickland's first prong adverse to petitioner is rejected.

1
2
3
4
5
6
7

> unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.*, at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at 123, 129 S.Ct. at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. *The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.*

8    *Harrington v. Richter*, 562 U.S. 86, 104-105 (2011) (emphasis added).

9         28 U.S.C. § 2254(d)(2) is somewhat confusing because it is seemingly tied to two

10   standards of review. The section regarding the deference owed to the fact findings in state court

11   utilize the word "unreasonable," the same word used in § 2254(d)(1) when referencing legal

12   rulings. And the well-established standard for "unreasonableness in (d)(1) is that fair minded

13   jurists could not come to the conclusion reached by the state courts. *Harrington v. Richter*, 562

14   U.S. at 101. It makes little sense to have two varying definitions for the same word.

15         Yet, § 2254(e)(1) again defines the deference given to factual findings: "[A] determination

16   of a factual issue made by a State court shall be presumed to be correct. The applicant shall have

17   the burden of rebutting the presumption by clear and convincing evidence." It remains unclear

18   whether, for factual questions, the § 2254(e)(1) presumption of correctness" applies to every

19   scenario, or whether one simply determines that the fact finding was AEDPA "unreasonable."

20   See *Wood v. Allen*, 558 U.S.290, 304-305 (2010). See also *Strickland v. Washington*, 466 U.S.at

21   698 (ineffective assistance of counsel involves mixed questions of law and fact.) Like the court

22   in *Wood*, for the ultimate determination of prejudice herein in the context of ineffective assistance

23   of counsel, the undersigned will apply the "unreasonableness" standard, as defined in the

24   emphasized language in *Harrington* above.[4]

25         In plea bargaining situations, defendants have a right to effective assistance of counsel.

26   *Lafler v. Cooper*, 566 U.S. 156, 162 (2012). Counsel's performance is determined by whether

27

28

---

[4] Moreover, petitioner has not sought to provide new evidence to meet any clear and convincing standard. On the contrary, petitioner's attack is based only on the state court record.

6

counsel's performance fell below objective, reasonable standards of competence (as ultimately

defined by AEDPA).

Prejudice is defined as:

> Having to stand trial, not choosing to waive it, is the prejudice alleged. In these circumstances a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.*

Lafler, 566 U.S. at 163-164 (emphasis added).

**Whether Judge Boeckman's Presiding at the Evidentiary Hearing Render the Fact- Finding Process Regarding Ineffective Assistance of Counsel Lacking in Due Process and Hence AEDPA Unreasonable**

The present case falls within the confines of AEDPA, 28 U.S.C. § 2254(d).  In most cases, the issue in habeas is whether the state courts interpreted federal law on a substantive issue in violation of clearly established law announced by the United States Supreme Court. 28 U.S.C. § 2254(d)(1).  This case is different in that federal substantive law is not at issue, but rather the state court's finding of facts. See 28 U.S.C. § 2254(d)(2).

28 U.S.C. § 2254 provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) […]
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Petitioner's first claim is that the fact-finding *process* was due process flawed or AEDPA unreasonable because the trial/state habeas judge, proceeded to the evidentiary hearing with preconceived, set in stone, credibility determinations. Although the language of the statute would

seem to be limited to the actual, factual determinations themselves, the Ninth Circuit Court of

Appeal (hereinafter "Ninth Circuit") has held otherwise:

> Ordinarily, we cloak the state court's factual findings in a presumption of correctness. 28 U.S.C. § 2254(e)(1). However, we afford such deference only if the state court's fact-finding process survives our intrinsic review pursuant to AEDPA's "unreasonable determination" clause. See Taylor, 366 F.3d at 1000. Here, the state court's fundamentally flawed fact-finding process, to the extent it constitutes a process, fails our intrinsic review.

Hurles v. Ryan, 752 F.3d 768, 790 (9th Cir. 2014).

It is not clear whether in determining the unreasonableness of the process used to determine the facts requires a deficient "application of Supreme Court authority, § 2254(d)(1), or whether unreasonableness is determined by a circuit court using normal methods of adjudication. Hurles focused on the "determination" language of § 2254(d)(2), although the holding was preceded by a discussion of Supreme Court authority on judicial bias. See also Taylor v. Tewalt, No. 20-35254, 2021 WL 4593381, at *2 (9th Cir. Oct. 6, 2021); Earp v Ornoski, 431 F.3d 1158, 1169-70 (9th Cir. 2005). On the other hand, determining whether a given process is AEDPA deficient is an ultimate question of law, so why would not § 2254(d)(1) apply, i.e., no relief unless established Supreme Court authority is violated. Under § 2254(d)(1), the circuit court is prohibited from refining an otherwise generally applicable Supreme Court holding to a distinct situation.

The undersigned will follow Hurles, in independently reviewing the process issue. Of course, such a review is not independent of controlling authority, but it does allow the refinement of general rules to specific situations.

Hurles set forth the general rules about having a biased judge preside over evidentiary hearings:

> Non-pecuniary conflicts "that tempt adjudicators to disregard neutrality" also offend due process. Caperton, 556 U.S. at 878, 129 S.Ct. 2252. A judge must withdraw where she acts as part of the accusatory process, Murchison, 349 U.S. at 137, 75 S.Ct. 623, "becomes embroiled in a running, bitter controversy" with one of the litigants, Mayberry, 400 U.S. at 465, 91 S.Ct. 499, or becomes "so enmeshed in matters involving [a litigant] as to make it appropriate for another judge to sit," Johnson v. Mississippi, 403 U.S. 212, 215–16, 91 S.Ct. 1778, 29 L.Ed.2d 423 (1971).

1  <u>Hurles</u>, 752 F.3d at 789-90.

2       <u>Hurles</u> also had found:

3          This case presents an especially troubling example of defective
   fact-finding because the facts Judge Hilliard "found" involved her
4          own conduct, and she based those "findings" on her untested
   memory and understanding of the events. *See Buffalo v. Sunn,* 854
5          F.2d 1158, 1165 (9th Cir.1988) (finding error when the court relied
   on "personal knowledge" to resolve disputed issue of fact); *cf.*
6          *Murchison*, 349 U.S. at 138, 75 S.Ct. 623 ("Thus the judge whom
   due process requires to be impartial in weighing the evidence
7          presented before him, called on his own personal knowledge and
   impression of what had occurred in the grand jury room and his
8          judgment was based in part on this impression, the accuracy of
   which could not be tested by adequate cross-examination.").

9

10  <u>Hurles</u>, 752 F.3d at 791.

11       Petitioner certainly has a colorable argument. He believes that because of the trial/first

12  habeas/evidentiary hearing judge's "hidden" credibility mindset, derived from previous

13  proceedings including trial, his evidentiary hearing was dead-on-arrival. What was the point of

14  the evidentiary hearing if petitioner's credibility was decided already? Nor was the credibility

15  mindset all that hidden—this Superior Court judge (Boeckman) had previously made credibility

16  findings in denying the initial state habeas petition. Furthermore, the trial judge's experience with

17  petitioner was developed over a period of years including trial, petitioner's absconding after trial,

18  sentencing, resentencing after appeal, and an initial habeas petition.

19       Nevertheless, unlike <u>In re Murchison</u>, 349 U.S. 133 (1955), the trial judge here did not

20  initiate the evidentiary hearing process. It came back to Judge Boeckman's court after a ruling by

21  the state supreme court, a not uncommon occurrence.

22       There are other aspects of <u>Hurles</u> at play here. The judge could not have been cross-

23  examined on his credibility findings derived from prior proceedings, and as Judge Boeckman

24  himself ruled, credibility was essentially the alpha and omega of this evidentiary hearing. It is

25  arguable that after years of dealing with petitioner whether Judge Boeckman was too "enmeshed"

26  with this litigant. However, there are distinguishing features as well. Judge Boeckman was not

27  "enmeshed" with petitioner as was the judge in <u>Johnson v Mississippi</u>, 403 U.S. 212, 215-16

28  (1971) (cited by the <u>Hurles</u> court), which involved a contempt action by a judge who had been

1   sued by defendant in a civil rights suit, *and where the judge had lost the suit*. Judge Boeckman

2   was not ruling on *his* prior actions vis-a-vis petitioner, as was the case with the trial judge in

3   Hurles.  Moreover, unlike Hurles, Judge Boeckman's credibility mindset was based entirely on

4   "matters of record"—trial, petitioner's absconding, petitioner's testimony at evidentiary hearing.[5]

5   In Hurles, the trial judge formed her opinion based on matters that were not of record, i.e.,

6   explaining how she had not actually participated in an adversary proceeding regarding the

7   defendant despite apparent, objective facts to the contrary.

8          Ultimately, petitioner's arguments here prove too much. The Supreme Court has never

9   held that a judge's "of record" observations at trial, without more, preclude him/her from later

10  ruling on credibility of a litigation participant. Indeed, just the opposite is true. Federal trial

11  judges are permitted to find at sentencing hearing a defendant's perjury at trial as grounds for

12  upward departure. United States v. Dunnigan, 507 U.S. 87 (1993).  In fact, the trial judge must

13  make specific credibility findings. Id. Of course, the trial judge is not available for cross-

14  examination concerning her views of the trial record. See also United States v. Momeni, 991 F.2d

15  493, 496 (9th Cir. 1993).  Moreover, judges are not required to recuse themselves for implicit bias

16  simply because the prior record reveals detrimental information about a litigation participant

17  which would clearly be known to a judge handling a subsequent proceeding.

18              The judge who presides at a trial may, upon completion of the
19      evidence, be exceedingly ill disposed towards the defendant, who
        has been shown to be a thoroughly reprehensible person. But the
20      judge is not thereby recusable for bias or prejudice, since his
        knowledge and the opinion it produced were properly and
21      necessarily acquired in the course of the proceedings, and are
        indeed sometimes (as in a bench trial) necessary to completion of
22      the judge's task. As Judge Jerome Frank pithily put it: "Impartiality
        is not gullibility. Disinterestedness does not mean child-like

23

24      ⁵ Counsel for petitioner in this proceeding asserted at oral argument that Judge Boeckman'
    "intelligence" finding used adversely to petitioner was not based on the record.  However,
25  demeanor at court proceedings, including one's expressions indicating sufficient intelligence not
    to fall for an incorrect assertion, is always a viable aspect of a credibility finding.  Indeed,
26  factfinders are encouraged to take demeanor into account. See, e.g., Ninth Circuit Model Criminal
    Jury Instructions 1.7 (listing factors which might be taken into account to assess credibility
27  including demeanor while testifying). While demeanor, including intelligence, is "of record," it
    might not be reasonable to infer a lack of credibility based on demeanor when the issue involved
28  is legal in nature. See infra.

                                            10

innocence. If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions." *In re J.P. Linahan, Inc.*, 138 F.2d 650, 654 (CA2 1943). *Also not subject to deprecatory characterization as "bias" or "prejudice" are opinions held by judges as a result of what they learned in earlier proceedings.* It has long been regarded as normal and proper for a judge to sit in the same case upon its remand, and to sit in successive trials involving the same defendant.

Liteky v. United States, 510 U.S. 540, 550-51 (1994) (emphasis added).

Further, "[j]udicial bias or prejudice formed during current or prior proceedings is sufficient for recusal only when the judge's actions 'display a deep-seated favoritism or antagonism that would make fair judgment impossible.'" Liteky, 510 U.S. at 555.

Nothing in the record herein reveals a deep-seated favoritism or antagonism held by Judge Boeckman. Even if some pre-disposition to find petitioner incredible were grounds for recusal, petitioner never made any such motion. At argument, counsel reflected that petitioner had no way of knowing that Judge Boeckman had such predisposed credibility concerns; therefore, no recusal motion could have been made. Not so, petitioner had already seen from Judge Boeckman's written initial habeas decision that petitioner lacked credibility prior to the state supreme court's order requiring an evidentiary hearing. On this record, petitioner remained silent about any alleged judge bias at his peril. It will not do to raise this apparent issue only after an adverse determination.

Petitioner argued that cases such as Tyler v. Swenson, 427 F.2d 412 (8th Cir. 1970) and United States v. Blanchard, 542 F.3d 1133 (7th Cir. 2008), found fault with judges, who in an evidentiary proceeding, commented upon facts found in a prior proceeding. However, Tyler, like Hurles were dealing with situations where the judges were utilizing facts acquired in prior off-the-record proceedings or incidents.

Blanchard, 542 F.3d 1133, lends more support to petitioner's position in this case. In Blanchard, the prosecutor was permitted to read into the record at trial the trial judge's previous comments made at a suppression hearing regarding credibility of a witness. The Seventh Circuit held that such amounted to judicial testimony in violation of Federal Rules of Evidence Rule 605. Id. at 1149. This case with a rather bizarre fact pattern, however, cannot be seen to overrule

11

1   Supreme Court authority cited above that a judge may indeed rely on his credibility opinions

2   derived from a trial proceeding in subsequent proceedings, or that a judge should not be found

3   biased or prejudicial in a later proceeding simply because the judge holds opinions based on prior

4   proceedings.

5          Based on the authority permitting a judge to make credibility findings based upon *on-the-*

6   *record* proceedings, the undersigned cannot find that it was a violation of due process for Judge

7   Boeckman to have presided at the evidentiary hearing, and/or an AEDPA unreasonable fact-

8   finding process.

9   **Whether the Factual Findings by Judge Boeckman Regarding Prejudice From**

10  **Ineffective Assistance of Counsel Was AEDPA Unreasonable Thereby Rendering the**

11  **Factual Findings Subject to De Novo Review in Federal Court.**

12         A major issue at the evidentiary hearing revolved about the

13  possibility/probability/certainty that the victim in the case, Santoya[6], would testify. Santoya was

14  an important witness in that although petitioner had seriously incriminated himself with his pre-

15  trial admissions to the police that he had essentially kidnapped Santoya and had indeed shot

16  Santoya, the evidence surrounding whether the shooting was premeditated, or simply an

17  unpremeditated attempted murder, assault with a deadly weapon, or even self-defense, was

18  fleshed out with Santoya's testimony.

19         A related issue was the extent to which, if any, defense counsel Ruffcorn had advised

20  petitioner that Santoya would not testify, and without Santoya's testimony, the prosecution would

21  have to dismiss the case or otherwise be very handicapped in pursuing premeditated attempted

22  murder or kidnapping. Included in this issue is when Ruffcorn communicated to petitioner his

23  (errant) belief in the "30-day rule," i.e., that the prosecution would not be able to call Santoya as a

24  witness if a cooperation agreement between the prosecution and Santoya was not revealed within

25  the 30 days before trial.

26  ////

27         [6] For efficiency purposes, the undersigned will dispense with titles for the various
    individuals who played a role in these issues—such would be unduly repetitive.  No disrespect is
28  intended.

12

1    The critical issue for the evidentiary hearing court, as it turned out, was whether Ruffcorn

2    took the plea offer decision away from petitioner, or whether conversely, petitioner was so

3    adamant about not accepting any go-to-prison plea offer that any errant advice concerning witness

4    Santoya played an inconsequential role in rejecting the plea offers.

5        The undersigned will now capture the highlights of certain proceedings which shed light

6    on the issues here.

7        1.   Trial Court Evidence

8        There was no record of the specific discussions between defense counsel and petitioner

9    regarding the plea offers. But one in-court discussion, just prior to the commencement of trial,

10   ultimately concerning the revelation that the "30-day rule" did not apply here for Santoya's

11   testimony, plays a role in the credibility analysis discussed below—insofar as it shows Ruffcorn's

12   mindset concerning what his pre-trial strategy was vis-à-vis Santoya:

13               MR. RUFFCORN:  Well, your Honor, I'm fumbling around here
14               because Mr. Fitzgerald just dropped a bomb on me.

15   ECF No. 33-4 at 34.

16               MR. RUFFCORN: […]

17               It's that this [Santoya] plea deal that was just announced by the DA,
             the code requires, I believe, 30 days written notice—30 days notice
18           in writing rather of any plea deal or reward or benefit for
             somebody's testimony. And I am paraphrasing but—I forget where
19           it is in the code.

20               The reason why that it is important is I made no bones about how it
             is with pending felony charges—serious felony charges that Adam
21           Santoya would get up on this stand and not invoke the Fifth?  I
             suppose it's possible.  *But, you know, highly, highly unlikely. And*
22           *absent the testimony of Santoya, then it is my opinion that there is*
             *no corpus.  There is no other even slight evidence of corpus and so*
23           *any statement by my client—inculpatory statements would not be*
             *coming in and the case goes away.*

24               The Court:  Okay.  If that was your state of mind and I fully accept
25           that it was, then it must have been shocking to you that the People
             answered ready on this case?

26               Mr. Ruffcorn: Yes.

27

28   ////

13

ECF No. 33-4 at 36-37 (emphasis added).[7]

> MR. RUFFCORN: […]
>
> So I have been led to believe all along that no deals have been made with Mr. Santoya. I'm kind of shocked that there was a deal made with Mr. Santoya with his [record].

ECF No. 33-4 at 37.

> MR. RUFFCORN: If—if on Friday morning when I announced ready I had been—I was told that there was some sort of deal with Santoya, I would have said "Hey, time out. I am not ready." Okay? I need to evaluate this, I need to talk with my client, it is a "C" change (phonetic) in tactics and so forth.
>
> This whole case has been frustrating for me, Judge. […] I have been begging the District Attorney's Office formally and informally, in e-mails and otherwise, get me a witness list, please. […] And I get nothing back. Okay? And so all along the client is relying on me to advise him or her, you know, what to do. What's best, what's best, what's best.

ECF No. 33-4 at 40.

The judge ultimately determined that because Ruffcorn, for whatever reason, had been surprised by this turn of events, he would get a short continuance in which Ruffcorn could prepare for Santoya's testimony and/or again engage in plea negotiations. As previously related, Ruffcorn, on his own, approached the prosecutor with a 12-14 year deal, but was rebuffed and told that no offer without an indeterminate life sentence would suffice.

On another subject important to Judge Boerkman, it was undisputed that petitioner absconded at the close of evidence, and was a fugitive for approximately two years.

   2.  Pre-Evidentiary Hearing Evidence

During the exhaustion process, petitioner's then counsel, Marcia Clark, contacted defense counsel Ruffcorn for information regarding the plea process in petitioner's case, but was initially told by Ruffcorn that no plea offers had been made for less than the maximum possible sentence (an indeterminate life imprisonment term). ECF No.17-13 at 40. In his declaration filed for state

---

[7] The italicized statement was an errant view of California law at the time it was made and plays a substantial role in finding that counsel acted below the objective standard of reasonable counsel during the plea offer process. See infra.

1   court habeas purposes, Ruffcorn now recalled the plea offers:

3       The alleged victim in this matter, Adam Santoya, was a key
        witness.  Without his testimony, the prosecution could not prove
4       their case beyond a reasonable doubt.  I knew that the alleged
        victim in the case, Adam Santoya, had serious felony charges
5       pending at the time of Mr. Valdovino's trial.  I therefore believed
        that he would have to invoke is Fifth Amendment right and refuse
6       to testify against my client.

7       Three pretrial plea offers were made by the prosecution.  The first,
        made on June 29, 2010, was for 16 years and eight months.  The
8       second, made on August 3, 2010, was for 16 years and eight
        months also, although my notes indicate it was for 16 years and
9       four months.  The third, made on October 4, 2010, was for a
        minimum of 18 years. […] [M]y understanding was that it would
10      not include a plea to premeditated attempted murder because that
        would require a life sentence.

11                                  ***

12      Before Mr. Eamon Fitzgerald was assigned to the case, I had
        conversations with another prosecutor, Deputy District Attorney
13      Maloney, regarding Santoya's status.  I asked what Santoya was
        going to say and Mr. Maloney replied that he did not know.  This
14      led me to believe that Santoya had not agreed to cooperate with the
        prosecution.  Furthermore, the plea offers seemed low given the
15      nature of the charges and this caused me to believe the prosecution
        had been unable to secure Santoya's cooperation.
16

17  ECF No. 17-13 at 46.

18          Ruffcorn declared that although he did not believe that the prosecution had secured

19  Santoya's cooperation before such cooperation was disclosed in court, no prosecutor had

20  previously told him that Santoya would not testify. Ruffcorn did admit that it had been his belief

21  that the prosecution was required to inform him of any Santoya cooperation agreement 30 days

22  before trial and that "[a]bsent such notice, I believed Santoya's testimony would not be

23  admissible." ECF No. 17-13 at 46-47. Ruffcorn conceded that he had been mistaken about the

24  30-day rule applying in petitioner's case. Id. Ruffcorn further declared: "I never advised Mr.

25  Valdovino to either accept or reject any of the plea offers made by the prosecution." Id. at 48.

26          Ruffcorn attached his contemporaneous trial notes to his declaration. ECF No. 17-13 at

27  73-76. Cryptic references were made to the plea offers, but for the most part they were

28  uninformative, i.e. just that they were "rejected." However, the notes did reveal that petitioner had

15

requested his counsel to approach the prosecution with a proposal that petitioner turn "states evidence" because petitioner desired to get out of jail pretrial. Ruffcorn's notes did indicate that he had approached the prosecution with petitioner's offer of assistance; the notes do not reflect that any of the plea offers were premised upon such "assistance" as opposed to being an immunity from prosecution request.

Petitioner also filed a declaration in which he stated that he had been advised about all the plea offers, but Ruffcorn had advised him to reject the offers based on the belief that Santoya would not testify and based on the "30-day rule." ECF No. 17-13 at 34-35. Petitioner relied on Ruffcorn's advice each time and rejected the plea offers accordingly.

3.   Testimony at the Hearing

The hearing started out with a deputy district attorney testifying that the trial judge at the time, Judge Ruggerio, probably would have accepted any of the plea offers. Because Judge Boeckman found such, and the issue is not disputed, no specific testimony will be set forth.[8]

Deputy District Attorney Hannah confirmed Ruffcorn's notes that petitioner had "expressed interest in providing law—info, information, to LE, law enforcement, in exchange for consideration on the case." ECF 46-1 at 38.[9]

Defense counsel Ruffcorn was next called. He confirmed that his signed declaration (although not written by him) was true: "Well, anytime I would sign a document like that it means the information is true." ECF No. 46-1 at 45. However, despite what he had stated in his declaration above, Ruffcorn stated "yes," to a question asking-- whether *prior to* the announcement in court that Santoya would be a witness, did Ruffcorn believe that the district attorneys "were going to be able to present [Santoya's] testimony." Ruffcorn doubled down on that testimony. Id. at 56. See also id. at 77 (Ruffcorn stated he never said to petitioner that he had an expectation or belief that Santoya would not testify). Later, Ruffcorn contradicted himself: Id.

---

[8] Also, no evidence has been presented that the prosecutor would have withdrawn the plea offers prior to their given expiration date.

[9] Petitioner had also made this request during his first interview with the police detective in which petitioner conceded shooting Santoya. It did appear that the request may well have been one for immunity from prosecution, or at least not going to state prison at all, as opposed to a specific plea offer involving state prison. ECF N. 46-1 at 39-40.

at 90 ("But there was an expectation that Santoya would not show, of if he did, he wasn't going to testify.") See also id. at 103 (It was Ruffcorn's thinking prior to the 30 days before trial that Santoya would not have been available as a witness.)

Ruffcorn did concede that he had spoken to petitioner about the "30-day rule" written notice about witness cooperation, but the timing of such conversation(s) was not clear. ECF No. 46-1 at 57-59. Later, Ruffcorn did say that he "may have told" petitioner that if the prosecution violated the "30-day rule," Santoya would not testify. Id. at 61. But it was "no, no never" that he had consistently advised petitioner during the pendency of the proceedings that the District Attorney's office would not be able to prove his case. Id. But see id. at 63 (Ruffcorn stated he "probably" told petitioner that the District Attorney would have to dismiss the case if Santoya did not testify.); id. at 95 (Ruffcorn did not believe there could be a corpus if Santoya did not testify.) Despite his declaration, Ruffcorn said he did not remember ever advising petitioner that if Santoya did show up at trial, he would invoke his Fifth Amendment rights. Id. But see id. at 90 (Ruffcorn stating the opposite.) Ruffcorn testified that he believed the first time he mentioned the "30-day rule" to petitioner when it was discovered that Santoya would be a witness. Id. at 70, 96.

Ruffcorn equivocated between testifying that he made no recommendations during the plea-bargaining process, stating "it's not my style." ECF No. 46-1 at 75.

> Q. And in your practice in criminal law, have you ever informed a client whether or not they should or shouldn't take an offer?
>
> A. I have never spoken that way to clients, ever.

Id.

But see ECF No. 46-1 at 111 (judge's question to a hypothetical analogous to facts in this case):

> Q. Okay. Would you then urge the client or recommend to the client that to avoid the life in prison sentence that the client consider the 16-year offer?
>
> A. I'm sure I would.

Ruffcorn was consistent in his belief that petitioner was not motivated to plead to anything if it meant prison. Ruffcorn unequivocally stated with respect to the earlier, lower 16 year offer the following: "Let me answer it this way: Mr. Valdovino was never going to plead to anything, ever." ECF No. 46-1 at 73. See also id. at 76:

1

2
3

THE COURT: […] You have told us that Mr. Valdovino was never going to plead to anything. […] In other words, was your belief based on something Mr. Valdovono said to you?

4

The Witness:  Oh, yes.

5

The Court:  What did he say?

6
7

The Witness: More than once that he's not going to plead to any of these felonies.

8

See also ECF No. 46-1 at 83 (Petitioner was not going to plead to anything); id. at 81-82

9

(same); id. at 222 (same).

10

Petitioner testified as well. He testified that he had consistently sought "consideration"

11

from the prosecution for his case, but it appeared that this mainly dealt with giving information

12

about other gang members. ECF No. 46-1 at 158, 162. The "consideration" sought was not

13

explicitly defined.  See id. at 196-197.

14

Petitioner also emphasized that he had not been averse to taking plea offers in the past.

15

ECF No. 46-1 at 183. Petitioner understood that ultimately it was his decision to plead even if

16

Ruffcorn was advising him to reject the pleas, and that "I'm the one that rejected it."  Id. at 194.

17

Petitioner also testified that Ruffcorn told him with respect to the first offer that it was very low in

18

light of the maximum penalties if convicted.  Id. at 164.

19

Petitioner also emphasized that Ruffcorn told him about the "30-day rule" from the first

20

visit they met together and onward, always emphasizing his (Ruffcorn's) belief that Santoya

21

would not testify because of the Fifth Amendment, and the prosecutor being unwilling to grant

22

Santoya immunity, or knowing about the "30-day rule," and that the case would ultimately be

23

dismissed.  See ECF No. 46-1 at 168, 172, 177, 195, 204, 205, 209, 211, 212, 213, 214. Petitioner

24

emphasized that Ruffcorn had told him that if Santoya did not testify, none of petitioner's

25

incriminating statements would be allowed at trial.  Id. at 212, 213.

26

Petitioner emphasized at many points during his testimony that but for Ruffcorn's advice

27

to not reject the pleas, and Ruffcorn's actions in essentially taking the decision away from him, he

28

would have taken the 16-year offer and 18-year floor offer. ECF No. 46-1 at 169, 183, 195, 201,

18

214. And it was not just advice Ruffcorn was giving, Ruffcorn was adamant that the pleas would

be rejected. See id. at 167 ("[W]e are going to go ahead and reject this plea bargain [(the 16-year

offer)] and move to trial immediately."); id. at 174 ("'Well, it is my [Ruffcorn's] obligation that I

communicate this offer to you, but we're going to go ahead and just reject it."); id. at 177 ("We

are going to reject it. It's an 18-year floor deal."). This testimony is somewhat inconsistent with

petitioner's previous statement that *he* rejected the plea offers.

Petitioner testified that he had conversations with his family about the plea offers

"pertaining to what Max [Ruffcorn] was doing in my case." ECF No. 46-1 at 201. However, no

family members were ever called to testify at evidentiary hearing. The judge asked petitioner the

(no-win) question whether he had been truthful at trial. Petitioner answered, "yes." Id. at 210.

Petitioner was further asked whether "your comments about what (sic) doing things in self-

defense at the jury trial were truthful?" Id. Petitioner answered, "yes." Id. at 210.

Prosecutor Fitzgerald testified. On two important points, Fitzgerald told Ruffcorn in no

uncertain terms that he had informed Ruffcorn prior to the announcement in court, that Santoya

would testify. ECF No. 46-1 at 135. He also testified that it was not Ruffcorn's style to "drive the

show," i.e., dictate to his clients what they would and would not do. Id. at 127.

4.   The Trial Court's Findings

Judge Boeckman made his findings in an oral statement at the conclusion of the hearing.

Because the state judge found credibility to be the overwhelming basis on which to make a

decision, he determined his oral remarks (although somewhat disjointed) to be his final rulings

which he would order transcribed to a formal order denying the state petition.  For the sake of

completeness all of the essential findings are set forth here:

> THE COURT: And before we proceed further, I want to both make
> a point and ask you a question, Mr. Somers. I perceive, perhaps
> mistakenly, a bit of surprise on your part that I would consider
> ruling today.
>
> And let me first say that it's clear to me from the paperwork that put
> a tremendous amount of work in this case and a lot of effort and
> time. And I don't want to shortchange you in terms of your ability
> to complete that work and feel that you've given it your utmost.
>
> The reason that I considered ruling after hearing argument today is

that I think the case comes down to a great extent, not entirely, but to a great extent, on credibility issues as you've just mentioned. And when that's true, usually the trier of fact doesn't benefit by a long delay between hearing evidence and making decisions. And so that's primarily the reason that I took the position that I did. But if you think that there would be a reason to delay decision or briefing or something of that nature, I'm willing to do so. But I think right now the case as I understand the law, and it's been well briefed by you and the attorney general's office is clearly I don't know all the procedural points on writs. We don't do a lot of writ work here when we don't have a local prison and it's limited.

But I think Strickland has two prongs. The first prong relates to the issue of whether there is demonstrated ineffective -- if there's IEC, basically. And if I look at that in this case, did the representation that Mr. Ruffcorn provide fall below an objective standard of reasonableness.

First of all, one finding I'm going to make from this hearing, which I believe I already felt was true before we started this hearing, is that your client is an intelligent person. He's a thoughtful person. And setting aside his level of education, whatever it may be, he 's manifested the ability to perceive, appreciate, and deal with the law and legal issues. As he put it, he did a great bit of the original work on the writ himself. And so I think he' s fully capable of doing things and perceiving things such as how to count and how to perceive whether or not this "30 day rule," which never really was applicable in Mr. Valdovino's case, should be something he considered.

When you look at the June 29th date when being told there is a 30 day rule and the prosecution has not met it, and that indicates that the alleged victim won't be testifying, sheer logic suggests that can't be true, and somebody with Mr. Valdovino' s intellect would know it. And so I don't think he relied significantly on that representation at the June 29th offer. At that date there wasn't even a trial date pending. At the August 2nd -- I think it was August 2nd – date when the 16 year 8 month offer was made, there was a pending trial date, but it was over 30 days away. It was September 8th, I believe. And so Mr. Valdovino's intelligent enough to know that well, the 30-day rule won't save the day if I reject this plea bargain because there's more than 30 days before the trial.

And so when I look at the first prong and I say okay. Let's take a look at the fact -- and I think it's undisputed -- that Mr. Ruffcorn was of the opinion that one of the things that needed to be evaluated in assessing a plea bargain was was it likely or unlikely that Mr. Santoya was going to testify. Among the factors that Mr. Ruffcorn considered was since a decades to life sentence was a potential exposure if the dice were rolled and Mr. Valdovino was convicted, and because there was a videotaped partial confession which left the room for a defense but which admitted a great deal of facts, if the prosecution was making a favorable plea bargain such as 16 years to life, that was a lower offer than he expected, which suggested to him the potential that Santoya had not agreed to

cooperate.

And there are other factors which Mr. Ruffcorn testified about. And so a question in doing the Strickland analysis would be on an objective standard of reasonableness were those factors that a competent effective defense attorney should consider. In other words, the likelihood of a key witness in testifying arguably is something that should be considered. And the potential that although there is a partial confession, if the corpus requirements are not met, that confession will not come into evidence and the prosecution 's case will have suffered fatal blows. These are things that I think a reasonable, competent defense attorney would consider. But I don't think a defense attorney would be recommending or should have been recommending to the defendant that plea bargains in that lower - - those lower parameters should be rejected. Certainly, I think by hindsight, they should not have been rejected with an actual recommendation by Mr. Ruffcorn that Mr. Valdovino reject those offers.

But there becomes a factual determination, and that is did Mr. Ruffcorn ever actually recommend to Mr. Valdovino that he not accept a plea bargain? I factually find that, at least to me, the credible evidence is that Mr. Ruffcorn did discuss those things with Mr. Valdovino. But my tentative view of the evidence is that Mr. Ruffcorn did not take it out of Mr. Valdovino's hands and reject the offers. And I find factually that Mr. Ruffcorn did transmit or tell Mr. Valdovino all three of these plea bargain offers. I don't think he told the defendant he should not accept them.

And so we get into—first of all, there's the legal issue, and that is depending on how you view the facts, was the first prong met. And I could make an argument both ways in that regard.

But as to the second prong, and that is, is there a reasonable not possibility but probability that a plea bargain offer would have been presented to the Court and the Court would have a accepted its terms, and the ultimate sentence would have been less severe than it was after the trial. The part where Mr. Valdovino has an issue or a problem is would he have accepted those plea bargain offers, because clearly they were better than the consequence he suffered. And I think it's undisputed that the trial court, Judge Ruggiero, and this Court would have accepted a plea bargain offer in the range of those three offers or more, a more severe sentence if that was reached after December or October 27. So the only real issue on the second prong is would the defendant have accepted those offers?

Mr. Ruffcorn was pretty clear in his testimony that he was persuaded. And, of course, remember his testimony here was after he had reviewed his notes and the other papers in the case. His testimony is that the defendant was out of custody, that he did not want to go back to prison, that he thought he would be in a bad circumstance, and that it was likely he would go to Pelican Bay State Prison. His mother was ill, he had family issues, and he believed personally that Mr. Santoya would not testify. That's what Mr. Ruffcorn said and those are his recollections.

21

And so I get to credibility issues and I look at certain things. it's clear that Mr. Ruffcorn's memory at various stages about these events was far from perfect. When he communicated with Ms. Clark he had no recollection of plea bargain offers being made. But that's also consistent with the fact, if the Court were to find it a credible fact, that the defendant always presented to Mr. Ruffcorn the fact that he had no interest in a plea bargain. And so -- and that he never suggested as Mr. Ruffcorn said, the defendant never suggested that he had an interest in a plea bargain offer.

So on these points, there is just a polar opposite recollection and testimony under oath by Mr. Ruffcorn and Mr. Valdovino. Mr. Ruffcorn, to this Court, was clear that he presented all the offers that he never made a recommendation yea or nay, that it was his custom and practice not to recommend a for or against a plea bargain offer but to present them to his client. Mr. Valdovino remembers and testifies very differently that, in fact, Mr. Ruffcorn gave him the reasons and then told him that based on those reasons the plea bargain offers should be rejected. And so, it's a credibility issue.

What does Mr. Ruffcorn have to gain by misstating it, at least in purposefully misstating it? I see very little, if anything, that he has to gain. It's clear to me that he thought well of Mr. Valdovino on a personal level even after this conviction, and after the defendant had absconded for a lengthy period of time. And there is no history on the part of Mr. Ruffcorn that would suggest that he would be untruthful.

I look at Mr. Valdovino and what do I have to consider when I'm looking for whether there is a reasonable probability that he would have accepted those bargains if he had been advised differently? It's this Court's view -- and I have a recollection of Mr. Valdovino's testimony at trial before this jury which testimony immediately preceded his absconding -- it's my view that he lied under oath to the jury in the jury trial regarding his purported defense of self-defense. And so I look at Mr. Valdovino compared to Mr. Ruffcorn and I see someone who I believe committed perjury at trial by lying under oath, so that causes me to question his testimony here. Do I think everything he said at trial was untrue? No. And that's typical of people who are willing to lie under oath. They say as much as they can truthfully so that their lies appear more truthful. And then on things where it's a true question of fact as to which they can't be disproved then they feel more comfortable lying. And so I look at this in evaluating Mr. Valdovino's testimony here. I also consider the fact that he fled, which is not indicative of an honest, credible person. And then look at whether or not as opposed to Mr. Ruffcorn, who has no apparent reason to lie, Mr. Valdovino has great deal of reasons to lie. The difference in his ultimate sentence is huge. And so his motive to be untruthful here and his intellectual ability and study of the history of the case which would enable him to effectively present a position which, if believed, would save the day for him. I consider all of that.

////

22

And so one -- one could make the argument that Mr. Valdovino is again trying to eat his cake and have it too. In other words, if he were to succeed here he would basically have had the opportunity to reject a reasonable plea bargain, take the case to trial to test the waters, roll the dice, and then if he failed, to undo everything and get his plea bargain anyway. Much the same as when he goes to trial out of custody, sticks with the case all the way until close to the time when if convicted he would be remanded. And he stays to the close of evidence and then he absconds so that the Court must instruct in his absence and then wait a period of time before justice is completed with judgment and sentencing.

So these are the reasons, Mr. Somers, why I deemed it not necessary for the Court to take this matter under submission for written arguments. Because in spite of your skillful and very good legal work as well as that done by the prosecution and the attorney general, it ultimately came down to a credibility issue. Because even if I were to determine the first prong of the Strickland analysis in favor of your client, and that is to conclude that there was ineffective assistance of counsel during the plea bargain stage, I don't believe your client was of a mind. And I don't think it's reasonably probable that your client was of a mind to accept any of those plea bargain offers nor do I think based on his testimony here that if your client had had an interest in doing that that Mr. Ruffcorn would have taken it out of his hands.

So those are all my tentative findings and thoughts and the reason that I didn't solicit further legal briefing or compilation of the evidence.

ECF No. 46-1 at 233-239.

Judge Boeckman then made it clear that he was not finding that Ruffcorn did not have a belief that Santoya was not testifying:

THE COURT: Okay. And I certainly don't want to leave the impression that I didn't think that Mr. Ruffcorn felt that Mr. Santoya would not be testifying. I think that was abundantly clear on October 27. I wouldn't have given him a six day delay if I hadn't concluded that he was surprised or at least thought it was less than likely that Mr. Santoya was going to be testifying. I don't disagree with that analysis. But I don't think it changes the Court's analysis as to the second part. I think it's arguably circumstantial evidence with regards to how strong Mr. Ruffcorn's belief was that Mr. Santoya would not testify. And depending on the strength of that belief, that could motivate an attorney to urge a client to not take the bargain because you may be missing an opportunity to do better.

But I think Strickland and the other cases point out that this can't all be a hindsight analysis of what was going on at the time. And that the credibility issue as far as who the decision maker was and whether or not your client was basically guided into by ineffective assistance of counsel rejecting a favorable bargain is still so much a

23

1    factual issue in this case. And I think credibility is important.

2    ECF No. 46-1 at 240-241.

3         The court then went on state, without objection, that it would simply attach the record of

4    his findings as the final decision in the case. ECF No. 46-1 at 242.

5         5.   Discussion on Factual Findings

6             A.   *Whether the Court's Credibility Findings That Petitioner Would Not Have*

7                   *Accepted a Plea Are Subject to Review Here*

8         The first sub-issue to be decided is whether a fact finder's credibility findings are ever

9    subject to later review in federal habeas. United States Supreme Court and Ninth Circuit authority

10   indicates that such findings are almost unassailable.

11        At bottom, an assertion that the fact-finder's credibility determinations were incorrect is

12   an assertion that the evidence was insufficient to support the verdict/ruling.  For example, in

13   many child abuse cases, the sum total of important evidence is the complainant's testimony that

14   abuse occurred and the accused's denial of such. On appeal after conviction, the challenge is to

15   the sufficiency of the evidence which is saying in other words that the victim lacked credibility.

16   See <u>Bruce v. Terhune</u>, 376 F.3d 950, 957-958 (9th Cir. 2004) (emphasis added):

17

18          We now turn to the merits of Bruce's sufficiency of the evidence
            claim.

19
            […] Because Catina's account of being molested on a bed along-
20          side four other sleeping children is inherently implausible, Bruce
            continues, no rational factfinder could have found him guilty
21          beyond a reasonable doubt on the four counts stemming from the
            September incident.

22          *Jackson* cautions reviewing courts to consider the evidence "in the
            light most favorable to the prosecution." 443 U.S. at 319, 99 S.Ct.
23          2781. If confronted by a record that supports conflicting inferences,
            federal habeas courts "must presume-even if it does not
24          affirmatively appear in the record-that the trier of fact resolved any
            such conflicts in favor of the prosecution, and must defer to that
25          resolution." *Id.* at 326, 99 S.Ct. 2781. *A jury's credibility*
            *determinations are therefore entitled to near-total deference under*
26          *Jackson. See Schlup,* 513 U.S. at 330, 115 S.Ct. 851 ("[U]nder
            *Jackson*, the assessment of the credibility of witnesses is generally
27          beyond the scope of review."); *see also United States v. Brady,* 579
            F.2d  1121,  1127  (9th  Cir.1978)  (explaining  that,  in  applying
28

1
2
3
4
5

> *Jackson* test for sufficiency of the evidence, "it is the exclusive function of the jury to determine the credibility of the witnesses, resolve evidentiary conflicts and draw reasonable inferences from proven facts"); *United States v. Ramos*, 558 F.2d 545, 546 (9th Cir.1977) ("[T]he reviewing court must respect the exclusive province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts, by assuming that the jury resolved all such matters in a manner which supports the verdict.").

6
7
8
9
10
11
12

> Here, Catina cried foul and Bruce denied all. The jury resolved this paradigmatic credibility contest by determining that Catina was more believable. *Except in the most exceptional of circumstances, Jackson does not permit us to revisit such credibility determinations.* And we cannot say-despite Bruce's protestations-that Catina's account of the September incident is physically impossible and simply could not have occurred as described. We therefore conclude that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319, 99 S.Ct. 2781; *cf. McGravey*, 14 F.3d at 1346-47 (upholding conviction for sexual molestation based entirely on the uncorroborated testimony of the victim).

13
14
15
16
17

The question here is whether a judge's credibility determinations as fact finder after a contested evidentiary hearing are subject to the same standards. The undersigned is not aware of authority which indicates that a judge's credibility findings as fact finder are subject to less credence than a jury's. In Earp v. Davis, 881 F.3d 1135 (9th Cir. 2018), a federal judge was sitting as a habeas corpus fact finder after an evidentiary hearing:

18
19
20
21
22
23
24
25
26
27
28

> Sitting as fact-finder, the trial court judge is tasked with weighing and making factual findings as to the credibility of witnesses. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). We review those findings and credibility determinations for clear error, *Larsen*, 742 F.3d at 1091–92, *which "does not vest[ ] us with power to reweigh the evidence presented at trial in an attempt to assess which items should and which should not have been accorded credibility,"* *Mondaca–Vega v. Lynch*, 808 F.3d 413, 428 (9th Cir. 2015) (quoting *Cataphote Corp. v. De Soto Chem. Coatings, Inc.*, 356 F.2d 24, 26 (9th Cir. 1966) ). Under Federal Rule of Civil Procedure 52(a)(6), "[f]indings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." In weighing the credibility of witnesses, "Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Anderson*, 470 U.S. at 575, 105 S.Ct. 1504 (citing *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)). Although credibility

1   determinations are not unreviewable,

2       *when a trial judge's finding is based on his decision to*
        *credit the testimony of one of two or more witnesses, each of*
3       *whom has told a coherent and facially plausible story that is*
        *not contradicted by extrinsic evidence, that finding, if not*
4       *internally inconsistent, can virtually never be clear error.*

5       *Id.* at 575, 105 S.Ct. 1504.

6   Earp, 881 F.3d at 1145-46 (emphasis added).

7       See also United States v. Rojas, 458 F.2d 1355, 1356 (9th Cir. 1972) ("It was for the trial

8   judge, as finder of fact, to assess the weight and credibility of the witnesses' testimony.") Nor

9   should it make any difference the precise nature of the evidentiary hearing in which credibility

10  determinations are made, i.e., trial versus post-trial evidentiary hearing. Earp, supra.

11      Petitioner's view that if Ruffcorn was found to lack credibility in certain areas, he *must* be

12  found to lack credibility in all, while a possible finding, is by no means mandated. A witness can

13  lack credibility on one issue, and easily be found credible on another, and vice-versa.[10] The trial

14  judge found Ruffcorn credible enough on the specific issue that petitioner would not have

15  accepted a plea no matter what the advice given, and that petitioner lacked credibility. At the very

16  least, Ruffcorn's testimony that petitioner indicated he wanted no part of a plea was not itself

17  contradicted by extrinsic evidence, nor was it inconsistent in itself.[11]

18      This is not to say that Ruffcorn was credible in all respects—even the trial judge found

19  some of Ruffcorn's testimony problematic, and the undersigned also finds much of his testimony

20  on other issues inconsistent and/or difficult to believe. See below. This is not to say that petitioner

21  lacked credibility in all respects, but the trial judge had some valid bases for disbelieving him on

22  this key issue.

23  ////

24      [10] See, e.g., Ninth Circuit Model Criminal Jury Instruction 1.7 (Credibility of Witnesses):
    "You may believe everything a witness says, *or part of it*, or none of it." (emphasis added).

25      [11] Petitioner's taking plea offers in the past on much less serious matters is not extrinsic
26  evidence that petitioner would have taken a plea here, nor is such inconsistent with the judge's
    finding that in this case, petitioner wanted no part of a plea. Indeed, such evidence could cut both
27  ways. It could mean that petitioner was amenable to accepting pleas, but it could also mean that
    having previously experienced prison petitioner wanted no plea offer which would send him back
28  for a very long time.

26

1    Thus, the undersigned first finds that Judge Boeckman's credibility determinations made

2    at evidentiary hearing regarding *whether petitioner would have accepted a plea* may not be

3    overturned by this court.

4        B.   *Even if All of the Credibility Findings Are Reviewed By the Court as a Basis for*

5             *Deciding Whether Petitioner Would Have Accepted a Plea Offer (Prejudice Prong*

6             *of Strickland), the Sum of the Credibility Findings On That Issue Could Not Be*

7             *Declared AEDPA Unreasonable*

8    The undersigned first addresses respondent's footnoted assertion that the findings of the

9    Superior Court after evidentiary hearing are not presumed to be the fact findings of the highest

10   state court to review the matter, even though the higher courts issued silent (unexplained) denials.

11   The "look through" doctrine, i.e., the explained reasoning of a lower court will be presumed to be

12   the reasoning of a higher court on silent denial, is well established. Ylst v. Nunnemaker, 501 U.S.

13   797, 804-806 (1991); Wilson v. Sellers, 138 S.Ct. 1188 (2018). Respondent argues that because

14   each of the layers of California courts has original jurisdiction over habeas petitions (a fact well

15   known to the United States Supreme Court), the facts found at evidentiary hearing are not

16   necessarily the facts found by the silent higher courts, citing Robinson v. Lewis, 9 Cal. 5th 883,

17   896 (2020).

18   Respondent's argument is fallacious. Simply because a higher California state court in a

19   habeas proceeding is not bound by factual findings of a lower court after evidentiary hearing, an

20   unremarkable holding given California's system, Robinson, supra, does not mean that the federal

21   courts on habeas review can make up facts, e.g., on credibility, when the higher courts have made

22   no such factual findings. Nor can the federal court create factual inferences that a higher court

23   might have made if it took pen to paper to make them, but the higher courts did not.

24   While a federal court is bound to scrutinize reasonable legal arguments to support a state

25   court ultimate finding, and the record is silent, Harrington, supra, assigning new, heretofore

26   unknown, factual findings to a higher court and speculated factual findings at that, to avoid an

27   errant fact finding by the only state court to set forth factual findings, would make federal habeas

28   review of factual findings on an established record nonsensical. Rhetorically, why have an

27

evidentiary hearing in state court?—we can just guess what facts or factual inferences might have been made in addition/subtraction to those made by the lower courts.[12] The undersigned now turns to the credibility analysis made by the only state court to make one.

Petitioner correctly focuses on the lack of credibility for some of Ruffcorn's testimony, and the undersigned would find that if the entire credibility issue on whether petitioner would have accepted the plea were based on all aspects of Ruffcorn's credibility, the credibility findings made by Judge Boeckman would be indeed AEDPA unreasonable.

Ruffcorn wrote to petitioner's state appellate attorney, Marcia Clark, and stated that he initially told her he did not believe any plea offers less than life in prison had been made to petitioner. Yet even later in court, he nevertheless remembered that petitioner was adamantly opposed to any plea for which he would go to state prison. Ruffcorn testified at hearing (at times) that he had no expectation or belief that Santoya would not testify. Yet in his signed declaration, which was in Marcia Clark's possession, Ruffcorn stated, "*Because I had been operating under the assumption that Santoya would not testify* and therefore believed the case could not be proven[.]" ECF No. 17-13 at 47 (emphasis added). Ruffcorn's "dropped a bomb on me" meltdown in court when informed that Santoya would testify, and that there was no "30-day rule," completely eradicates any notion that Ruffcorn really had no expectation one way or the other about whether Santoya would testify. See supra, Trial Section.

Ruffcorn also stated in his declaration that "he never advised Mr. Valdovino to either accept or reject any of the plea offers made by the prosecution[]" and at hearing, that he did not recommend whether petitioner should accept or reject the plea agreement; that such was his "style." ECF Nos. 17-13 at 48; 46-1 at 75. This is belied by his protestation at the commencement of trial, set forth above, that: "*And so all along the client is relying on me to advise him or her, you know, what to do. What's best, what's best, what's best.*" ECF No. 33-4 at 40 (emphasis

---

[12] For example, a state court might make an unsupported legal ruling based on found facts when it denied a petition. If there is a reasonable argument that under correct law, the denial of the petition would still occur, the federal court is bound to consider that the higher court would have known of the correct law when it silently denied the petition. Such does not mean that facts and factual inferences, e.g., on credibility of witnesses, can be reinvented in the face of a silent higher court record.

added.) Indeed, when Judge Boeckman asked Ruffcorn a question at hearing concerning whether Ruffcorn would recommend a plea bargain, in which the analogous facts of this case were hypothecated, Ruffcorn replied: *he would urge the client or recommend to the client that in order to avoid a life in prison sentence, he would recommend the 16 year offer.* ECF No. 46-1 at 111. As observed by petitioner's counsel, in another Eastern District of California habeas case, Ruffcorn's testimony about recommending plea offers was as follows:

> Ruffcorn explained that petitioner's rejection of the eight-year offer was, in essence, "betting his life," because it was "too risky" with the lengthy sentence petitioner faced if found guilty. RT 284, 285. *Accordingly, his "advice has been strong to resolve this case."* RT 285.

Stein v. Dir. of Corr., No. CIV S-05-1592 GEB KJM P, 2009 WL 3112421, at *4 (E.D. Cal. Sept. 23, 2009) (emphasis added).

As was set forth in the evidentiary hearing portion of the facts, Ruffcorn was not even consistent at the hearing on key issues. The undersigned could go on, but it is clear that Ruffcorn had either no real clue about most of what happened with the plea offers so many years ago, or he flavored his testimony with his own self-interest not to be found a Strickland level deficient attorney. However, insofar as Ruffcorn testified that petitioner was not amenable to *any* plea, no matter the advice, which would result in state prison time, no such specific impeachment exists.[13]

But there is another side to the credibility issue. Petitioner testified that he would have accepted the offers had not Ruffcorn "suggested" he reject the offer. The hearing judge, Judge Boeckman, was entitled to view this testimony skeptically in light of the judge's view that petitioner would testify falsely when he had to. Judge Boeckman had asked petitioner the no-win question about whether petitioner's [problematic] self-defense testimony was truthful—petitioner answered unequivocally—yes. The fact that petitioner absconded right after the trial evidence closed bespeaks, *inter alia*, a general deception on petitioner's part, i.e., he had promised to appear and he broke that promise. Any judge might take such absconding into great account when

---

[13] Ruffcorn's desperate attempts to obtain some type of plea after the Santoya-would-testify is not viewed by the undersigned as specific impeachment. Rather, it is seen for what it was—an attempt by Ruffcorn to get any deal which might tempt the so far recalcitrant petitioner into making a plea.

judging truthfulness. The judge found that petitioner had quite a bit of self-interest in a

retrospective answer that he would have accepted the plea.  See Ninth Circuit Model Criminal

Jury Instruction 1.7 (4) and (5). And while the judge's finding on petitioner's "intelligence," i.e.,

that petitioner would have known of the legal inapplicability of the "30-day rule" to his situation

at all times is open to question, it is important to note that petitioner was not unintelligent in

weighing the pros and cons of plea offers, and clearly knew that the "30-day rule" would not

commence until 30 days before trial. The judge also found petitioner not to be credible in his

testimony that although he desired to plead to the offers, Ruffcorn took the decision out of his

hands. [14]

Certainly, all of this played a critical role which led to the judge's rejection of petitioner's

credibility at hearing. Once petitioner's lack of credibility was found on the key issue of

willingness to accept a plea offer, such was sufficient in itself to render the findings on this issue

AEDPA reasonable. And the fact that another witness who affirmed that petitioner was unwilling

to accept any plea offer may have lacked credibility on other matters is insufficient to overturn

the ultimate ruling. The trial judge's findings about petitioner's lack of credibility were not in

themselves AEDPA unreasonable.

In sum, even if all the credibility evidence is weighed in resolution of the issue whether

petitioner would have accepted the plea offer, assuming that Strickland level faulty advice had

been given in the first place, the problem is that *both* Ruffcorn and petitioner were not credible.

In such a situation, a judge sitting in habeas jurisdiction must find in this AEDPA case that this

"tie" means petitioner has not met his burden of proof on the key "acceptance of the plea offer"

issue.

### *Whether Ruffcorn's Actions During the Plea Offer Phase Constitute Strickland Level Ineffectiveness*

The petition could be denied simply on the basis that petitioner did not show to a

reasonable probability that he would have accepted any of the plea offers.  However, by now it is

---

[14] While much of Judge Boeckman's oral findings were somewhat disjointed and stream of consciousness, the judge's findings about petitioner's lack of credibility were clear and certain.

clear that the prejudice question is close, so for the sake of completeness, and in order to forestall any remand to decide *Strickland*'s prong one—reasonableness of counsel's action—the undersigned addresses the issue.

The first issue to be discussed here is procedural, i.e., whether AEDPA deference applies, or whether the undersigned makes *de novo* findings on this issue. As found supra, fn. 2, Judge Boeckman did not render a decision on *Strickland's* first prong. Nor did the state's higher courts make any announced findings on this issue. In such a situation, the presumption that the higher courts ruled on all aspects of a claim presented in a lower court has been rebutted.

> "If the claim was not 'adjudicated on the merits' by the state court, the review is to be de novo." *Amado v. Gonzalez*, 758 F.3d 1119, 1130 (9th Cir. 2014) (quoting *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002)). Where a state court has adjudicated a claim on the merits with a written decision denying relief based on one element of the claim and, therefore, does not reach the others, the federal court gives section 2254(d) deference to the element on which the state court ruled and reviews de novo the elements on which the state court did not rule. *See Rompilla v. Beard*, 545 U.S. 374, 390, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005).

*Kipp v. Davis*, 971 F.3d 939, 949 (9th Cir. 2020).

Having determined that a *de novo* review of Strickland's first prong applies, i.e., whether counsel's performance fell below an objective standard of reasonableness, the undersigned finds that counsel's thought process was legally deficient, and hence colored his advice to petitioner in such a way that counsel's performance in the plea offer stage fell below an objective standard of reasonableness.

Not every attorney mistake, especially in hindsight, will constitute representation so deficient that counsel is effectively not acting as counsel. However, after putting aside a result-oriented-in-hindsight approach, *Strickland*, 466 U.S. at 689 held the following:

> As all the Federal Courts of Appeals have now held, the proper standard for attorney performance is that of reasonably effective assistance. *See Trapnell v. United States,* 725 F.2d, at 151–152. The Court indirectly recognized as much when it stated in *McMann v. Richardson, supra,* 397 U.S., at 770, 771, 90 S.Ct., at 1448, 1449, that a guilty plea cannot be attacked as based on inadequate legal advice unless counsel was not "a reasonably competent attorney" and the advice was not "within the range of competence demanded of attorneys in criminal cases." *See also Cuyler v. Sullivan, supra,*

31

446 U.S., at 344, 100 S.Ct., at 1716. When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness.

More specific guidelines are not appropriate. The Sixth Amendment refers simply to "counsel," not specifying particular requirements of effective assistance. It relies instead on the legal profession's maintenance of standards sufficient to justify the law's presumption that counsel will fulfill the role in the adversary process that the Amendment envisions. *See Michel v. Louisiana*, 350 U.S. 91, 100–101, 76 S.Ct. 158, 163–164, 100 L.Ed. 83 (1955). The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.

It is worth noting that in Lafler, 566 U.S. at 163, an attorney can be found to be acting below the reasonable effectiveness standard when advising a client to reject a plea offer because he surely cannot be convicted at trial. Such is risky business indeed.

The undersigned does *not* find Ruffcorn ineffective simply because he initially believed that without Santoya's testimony, proving the more serious attempted murder charges would be difficult for the prosecution. Santoya refusing to testify or take the "Fifth" was a reasonable possibility given that serious charges were pending against him. Santoya's gang status, at the very least, would certainly have come out in petitioner's trial which was an important factor in Santoya's own proceeding. Moreover, despite prosecutor potential bluffs, there is a logical reason why the first offer, which all have characterized as "low" given the potential for punishment on the more serious charges facing petitioner, was given, i.e., Santoya's testimony had not yet been secured. Finally, Ruffcorn had "asked around" seeking to acquire intelligence on the possibility/probability that Santoya would testify.

Nor does the undersigned find Ruffcorn's performance deficient simply because he had an expectation that Santoya would not testify. As just stated, the first two relatively low (but still relatively punitive) offers bespoke some difficulty with the prosecution case—most likely procuring Santoya's testimony. That expectation should have waned a bit when the third much more relatively punitive offer was made, the 18 year "floor," as for some reason (most likely Santoya) the prosecution was becoming more confident. But the underlying reason for doubting Santoya's presence at trial was still in play.

32

1   However, Ruffcorn was legally and factually wrong when he surmised that without

2   Santoya's testimony, a "corpus" issue would preclude petitioner's very damaging statements from

3   being admissible. It is California law now, *and was then at petitioner's trial*, that a corpus delicti

4   (some relevant adverse evidence outside of the statements itself) is not necessary for statement

5   admissibility.

> We are therefore persuaded that insofar as the corpus delicti rule
> has directly barred or restricted the admissibility in evidence of
> otherwise relevant and admissible extrajudicial statements of the
> accused, on grounds that independent proof of the crime is lacking,
> the rule has been abrogated by section 28(d). Under this
> constitutional provision, *a corpus delicti objection to the
> introduction of defendant's statements is no longer valid as such.*
> [footnote omitted.]

11   People v. Alvarez, 27 Cal. 4th 1161, 1177 (2002) (emphasis added).[15]

12   Of course, evidence independent of a defendant's statement itself must be provided to

13   secure a conviction, Alvarez, 27 Cal. 4th at 1169-1171, but that is much different than

14   admissibility of an out-of-court adverse statement. And, once a statement is admitted, it can be

15   relevant to *all* charges—in for a penny, in for a pound. A lawyer is not acting competently when

16   he lacks correct knowledge of law very important to the case.

17   Thus, Ruffcorn's belief during the pretrial period, including plea negotiations, all the way

18   up to trial, (see supra Trial Court section) was legally in error.

> MR. RUFFCORN: [...] And absent the testimony of Santoya, then
> it is my opinion that there is no corpus.   There is no other even
> slight evidence of corpus *and so any statement by my client—
> inculpatory statements would not be coming in and the case goes
> away*.

22   ECF No. 33-4 at 37.

23   See also ECF No 46-1 at 95 (Where Ruffcorn testified that it was his [errant] belief that

24   the "corpus" rule precluded petitioner's incriminating statement from being admitted).

25   This errant opinion on the part of Ruffcorn had to have substantially, adversely affected

26   his plea offer discussions. In fact, it was the difference between "night" (the lack of Santoya's

27

28   [15] "Thus, to the extent the corpus delicti rule limits the admissibility of relevant evidence, it was abrogated by [Cal. Const. art. I,] section 28(d)." Alvarez, 27 Cal. 4th at 1174.

testimony meant petitioner's statements would not be admitted and the "case would go away"),

and "day" (petitioner's damaging statements would be admitted regardless of Santoya's testimony

and petitioner in all likelihood would be convicted of at least some of the charges from his

statement, most likely the kidnapping and assault with a deadly weapon charge and gang or gun

enhancements, with the addition of some easily observable other "corpus" evidence, see below).

It must be recalled that petitioner admitted in his statement to the police that he had Santoya enter

his car to "smack him around." [16] Santoya rode in the front passenger seat with petitioner in the

rear seat to make sure Santoya did not pose a danger to either petitioner or the car's driver.

Experts testified that it would be extremely unlikely that a rival gang member (Santoya) would

voluntarily get into a car driven by the rival's arch enemy. Petitioner also conceded shooting

Santoya, and it just so happened that Santoya was shot with his back to petitioner, i.e., where his

wallet was able to stop the bullet. Petitioner's problematic self-defense theory would have

convinced no reasonable jurors, and it was quite possible that with evidence at trial that this was a

gang motivated incident with petitioner and Santoya in opposite gangs, and petitioner's directing

the "correct" place at which petitioner directed the car to stop when Santoya was shot, could have

resulted in a verdict of premeditated attempted murder.

     One thing petitioner and Ruffcorn agreed upon was that petitioner's post-arrest statement

to the police was very incriminating. See ECF No. 46 at 51, 162-163, 169, 176. Indeed, with the

easily foreseen voluminous expert testimony on gangs and their propensity to do violence on each

other, including the fact that Santoya would not have voluntarily entered the car of a rival gang

member, it contained the elements necessary for a conviction on kidnapping and assault with a

deadly weapon.

     In short, petitioner, in all probability and because of his statement, was going to prison for

a significant period of time *regardless of Santoya's testimony*. Petitioner should have been

advised of this probability when the plea offers of 16 and 18 years were on the table. Instead, he

was advised by Ruffcorn, who had a state of mind that the case "would go away" without

---

[16] Petitioner's statement was characterized at trial by the detective who took petitioner's statement. ECF No. 33-4 at 362-376.

1   Santoya's testimony because petitioner's statement would be inadmissible.  It strains credulity to

2   believe that Ruffcorn's state of mind played no part in his plea offer advice or presentation to

3   petitioner.

4          Ruffcorn was also factually in error when he surmised that there was no "corpus," whether

5   that corpus was errantly thought to be needed for statement admissibility, or correctly for

6   conviction of a crime. This fact was made clear when the judge easily found "corpus," at

7   petitioner's trial.  Ruffcorn, again, made his legally incorrect "corpus" objection to the admission

8   of petitioner's statement, ECF No. 33-4 at 350, and the judge found, nevertheless, that a "corpus"

9   for assault with a deadly weapon, at least, had been "certainly" established thereby permitting the

10  statement to be directed to all charges. ECF No. 33-4 at 352.[17] There could have been no

11  reasonable doubt of the "corpus," which requires only a slight or minimal corroboration that a

12  crime had been committed. See People v. Jones, 17 Cal. 4th 279 (1998).[18] The "corpus" was

13  comprised of, inter alia, the recovered bullet; the undisputed fact that Santoya had been shot; a

14  holster found in petitioner's residence consistent with the type of gun used to shoot Santoya;

15  recovery of clothes at petitioner's residence consistent with the attire of the person who shot

16  Santoya; the police officer's testimony that Santoya told him that he had been shot by petitioner;

17  the identification of petitioner's silver Jaguar as the car in which Santoya was kidnapped, as

18  reported to the officers;  petitioner's arrest after he exited the silver Jaguar; as well as lay witness

19  testimony to the same effect of Santoya claiming he had been shot. ECF No. 33-4 at 259, 489,

20  491, 492. There was a reason why police officers were able to secure a warrant to search

21  petitioner's house and arrest him prior to any statement petitioner gave—that was all the corpus

22

23          [17] It is not clear whether Judge Boeckman and the prosecutor also held the errant belief
    that a corpus had to have been established before petitioner's statements could come in.
24  Moreover, even if they both were initially in error, such error may well have been corrected at a
    later stage during trial. Regardless, reasonable counsel could not predicate a basis for not
25  knowing the law during plea negotiations on the chance that perhaps the court at trial will not
    either.
26          [18] "As Jennings and Robbins demonstrate, we have never interpreted the corpus delicti
    rule so strictly that independent evidence of every physical act constituting an element of an
27  offense is necessary. Instead, there need only be independent evidence establishing a slight or
    prima facie showing of some injury, loss or harm, and that a criminal agency was involved."
28  People v. Jones, 17 Cal. 4th 279, 303 (1998).

1  necessary—even if it were the rule, which it is not, that a corpus had to be established before a

2  statement could be admitted as evidence. Again, reasonable counsel would have advised

3  petitioner in plea offer discussions that petitioner's statement with all of its damaging admissions

4  was certainly going to be played to the jury.

5       Next discussed is the issue of Ruffcorn's misapprehension of the "30-day rule." It is

6  undisputed in this action that Ruffcorm mistakenly believed that Santoya would not be able to

7  testify if the prosecution did not give written notice of a "deal" the prosecution would have made

8  with Santoya. It is disputed when petitioner became aware of Ruffcorn's belief in the "30-day

9  rule," with petitioner believing it to be referenced at all plea offer discussions, and Ruffcorn

10  believing that it was not mentioned to petitioner until after the court hearing in which Ruffcorn

11  was corrected as to his misapprehension. See ECF No. 46-1 at 60, 72, 73, 174, 175, 179; but see,

12  id. at 57-58.

13       However, it is unlikely that the misapprehension played much role in the early plea

14  negotiations because most of the negotiations took place, especially the 16-year offers, before any

15  "30-day rule" could actually have come into effect. And it was not possible to predict with any

16  certainty that even if such a rule did exist, that the prosecutor would have been ignorant of such a

17  rule. The main issue, as exhaustively set forth above, was whether Santoya was going to testify at

18  all, or because of Fifth Amendment issues, regardless of any "30-day rule." Thus, Ruffcorn's

19  misapprehension about a "30-day rule," whenever it became known to him, pales in comparison

20  to the real issue surrounding Santoya's testimony—whether he was going to testify at all. But

21  whether Santoya would testify was not the major consideration to be taken into account during

22  the plea offer period.

23       As set forth above, the primary error on Ruffcorn's part was his legal error concerning the

24  admissibility of petitioner's statement. As the undersigned said at hearing, petitioner's statement

25  had placed the prosecution on "third base" already. Santoya's testimony, while not unimportant in

26  demonstrating the potential premeditation for petitioner's actions and more easily getting the

27  prosecution to "home plate" with the more serious charges, was essentially additive, or fleshing

28  out, to what petitioner had admitted already, and additive to the statement's already problematic

protestations of innocence, i.e., self-defense. As was set forth in the commencement of this

Section, with respect to Santoya's testimony, it was not necessarily unreasonable for counsel to

believe that Santoya might not testify, and was reasonable in postulating that to petitioner for

consideration in the "day scenario" plea offer setting— i.e., *if it was also postulated that*

*petitioner's statement would be admitted at trial and how damaging that would be*. But again, the

singularly important issue demonstrating counsel's ineffective performance was in not

recognizing that petitioner's statements would come into evidence thereby making a conviction

on some charges likely, even perhaps all, without Santoya's testimony.

Reprising the "prejudice" argument here for a moment, the issue is whether petitioner

would have accepted the plea offer if he knew of the advice that should have been given, i.e., the

statement's certain admissibility, that in no way was the case going to go away without Santoya's

testimony, and that in all probability, petitioner would have been convicted of some of the

charges even if Santoya did not testify. The undersigned has some pause here, once again,

because if petitioner had been advised he was probably going to prison anyway on some charges

after trial because of his statements, what difference would it make if that same result was

occasioned by a plea. Absent Judge Boeckman's strong finding that petitioner would not have

ever accepted any plea bargain that would have sent him to prison—a finding that cannot be

overturned here based on AEDPA standards—the prejudice finding here might have been

different.

Insofar as Strickland's first prong becomes relevant, the undersigned finds that petitioner

has demonstrated that the actions of his defense counsel Ruffcorn in the plea offer setting were

not those of objectively reasonable counsel. Counsel should know the law which significantly

affects a critical phase of a prosecution.

**Whether the California Court of Appeal's Rejection of Petitioner's Argument that Cal.**

**Penal Code § 654 Prohibited the Imposition of a Consecutive Sentence for the Kidnapping**

**Count Was Unreasonable**

Petitioner argues at length in the traverse that the California Court of Appeal got it wrong

when it permitted dual punishments prohibited by Cal. Penal Code § 654, i.e., it found possible

37

that the intent to kidnap was separate from the intent for attempted murder, and that "fundamental fairness," requires a vacating of the consecutive ("multiple") punishments.  The Court of Appeal held the following:

> Defendant contends his punishment for kidnapping must be stayed because "the kidnapping was committed in order to accomplish the attempted murder and therefore had no independent objective." He argues the court erred as a matter of law in finding to the contrary, i.e., "that the crimes for kidnapping and attempted murder were independent and were not merely incidental one to the other, and that the defendant entertained separate criminal objectives for each crime." We disagree with defendant because there was substantial evidence he had dual objectives in kidnapping and attempting to murder A. (*People v. Osband* (1996) 13 Cal.4th 622, 731 [standard of review for a Penal Code section 654 claim].)
>
> Defendant told a detective who interviewed him postarrest that when he left the park with A., he perhaps was going to "fucking smack him or something like that" but had no intention of killing him. Seizing on defendant's statement, the People in closing argued that the objective for the kidnapping could have been instilling fear of and respect for the Norteño gang in the community. Indeed, a gang expert testified that a Norteño's act of going into the territory of the rival Sureño gang (as the park was) and getting a rival gang member to go with the Norteño would increase the Norteño's status in the gang and instill fear in the Sureños. Defendant then could have later formed a separate intent to kill A. when they were driving, which is supported by A.'s testimony that when the driver stopped at several turnouts, defendant said, " 'No, [n]o. Not right here, not right here,' " which suggested defendant might have been looking for what he considered a good spot to shoot A. Under these circumstances, the court's finding of dual objectives was supported by substantial evidence.

People v. Valdovino, No. C072078, 2013 WL 6001038, at *1 (Cal. Ct. App. Nov. 13, 2013).

Petitioner recognizes that Cal. Penal Code § 654 has been held to be constitutional, citing Watts. v. Bonneville, 879 F.2d 685, 687-688 (9th Cir. 1989).  Moreover, petitioner would have to show that the U. S. Supreme Court has held a statute like § 654 violates some constitutional right, which petitioner has not.  Indeed, the statute is designed to avoid constitutional problems like double jeopardy. Petitioner also recognizes that misapplication of state law is not an issue for which a federal habeas court has cognizance.  See Estelle v. McGuire, 502 U.S. 62, 67 (1991).

Petitioner seeks to avoid the no review of application of state law rule by asserting an all-encompassing exception—"fundamental fairness."  Petitioner believes that the Court of Appeal cherry picked some of petitioner's statements to find the possibility of intent to kidnap and intent

1   to murder. The Court of Appeal was entitled to rely on petitioner's incriminating statement in

2   part, and reject the more problematical aspects of it, e.g., Santoya got in petitioner's car

3   voluntarily so that petitioner could smack him around, and later decided that a "smacking around"

4   was insufficient—only a killing would do. Moreover, the evidence at trial as a whole could

5   certainly be interpreted to show intent to kidnap and murder which arose at different times.

6   Petitioner also focuses on the bald statement by petitioner that he never had an intent to

7   kidnap, at least not right away, because he said he did not intend to kidnap petitioner at the time

8   Santoya got in his car, or that the intent to kidnap only came to fruition when petitioner

9   determined to shoot Santoya. Or is it vice versa—that petitioner formed the intent to murder

10  when compelling Santoya to get in petitioner's car as that was the intent all along, and kidnapping

11  was simply an indivisible part of the plan?

12  Petitioner's arguments do not involve an interpretation of law by the Court of Appeal that

13  is fundamentally unfair. Rather, the arguments are fundamentally flawed in that they simply

14  contest the application of state law. Accordingly, this claim should be denied.

15  *Certificate of Appealability*

16  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has

17  made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The

18  certificate of appealability must "indicate which specific issue or issues satisfy" the requirement.

19  28 U.S.C. § 2253(c)(3).

20  A certificate of appealability should be granted for any issue that petitioner can

21  demonstrate is "'debatable among jurists of reason,'" could be resolved differently by a different

22  court, or is "'adequate to deserve encouragement to proceed further.'" Jennings v. Woodford, 290

23  F.3d 1006, 1010 (9th Cir. 2002) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 (1983)).

24  ////

25  ////

26  ////

27  ////

28  ////

39

Petitioner has made a substantial showing of the denial of a constitutional right in the following issue(s) presented in the instant petition: ineffective assistance of counsel claims.

*Conclusion*

In accordance with the above, IT IS HEREBY RECOMMENDED that:

1. The petition for writ of habeas corpus (ECF No. 1) be denied; and

2. The District Court issue a certificate of appealability as to the ineffective assistance of counsel claims.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: November 3, 2021

/s/ Gregory G. Hollows
UNITED STATES MAGISTRATE JUDGE